UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LESAMUEL PALMER,

     Petitioner,

-vs-                CASE NO.:3:14-cv-362-J-20JBT

RONNIE L. MORRIS, et al.,

     Defendants.

_____/

## DEPOSITION OF LESAMUEL PALMER

Reported by Elaine Richbourg, a Court Reporter
and Notary Public, State of Florida at Large, taken
in the offices of Santa Rosa Correctional
Institution, 5850 East Milton Road, Milton, Florida,
on Thursday, December 15th, 2016, commencing at
approximately 12:30 CST.

### ELAINE RICHBOURG
**COURT REPORTER**
**2320 Brightview Place**
**Cantonment, Florida 32533**
**(850) 968-6465**
**elainerichbourg@cox.net**



ORIGINAL Ex. A

1                          **<u>APPEARANCES</u>**

2     For the Plaintiff:

3                         LESAMUEL PALMER, Pro Se
                          Santa Rosa Correctional Institute
4                         5850 East Milton Road
                          Milton, Florida  32570
5

6     For the Defendants:

7                         MARK URBAN, ESQUIRE
                          Assistant Attorney General
8                         The Capitol, PL-01
                          Tallahassee, FL  32399-1050
9

10

11

12    COURT REPORTER:
            ELAINE RICHBOURG
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>INDEX OF TRANSCRIPT</u>

2    WITNESS:

3       LESAMUEL PALMER

4          Direct Examination by Mr. Urban          04

5    Certificate of Oath...............................77

6    Reporter's Deposition Certificate.................78

7

8                       STIPULATION

9

10          It is stipulated and agreed by Counsel for the

11          parties that the deposition is taken for the

12          purpose of discovery and/or evidence; that all

13          objections save as to the form of the question

14          are reserved to the time of trial; and that the

15          reading and signing of the deposition are not

16          waived, together with notice of the original

17          hereof.

18                   *  *  *  *  *  *  *

19

20

21

22

23

24

25

1    haven't mentioned yet were you being treated for

2    during 2011, if you can recall, that we haven't

3    talked about yet, if any?

4        A    I don't know.  I don't know.  I don't know

5    no more.

6        Q    There's no others that you can think of,

7    at this time?

8        A    No, sir.  Not at this time.

9        Q    What about in 2012, and I'll ask it again:

10   What are the medical issues that you haven't

11   previously mentioned that we haven't previously

12   discussed were you being treated for during 2012 or

13   were you diagnosed with having?

14       A    That's all I know.  That's all I know.

15       Q    Now, that I know you're receiving

16   treatment for the conditions that we've discussed,

17   are there any medical conditions that you believe to

18   be -- that you're suffering from that you are not

19   receiving treatment for?

20       A    I had a damage -- I had damage to my rib

21   area and it's still giving me pain.

22       Q    And when did the damage to your rib area

23   occur?

24       A    It happened in 2012.

25       Q    When specifically in 2012?

Ex. A

1       A     January the 19th.

2       Q     So you're saying that that was a result of

3  the incident in question here?

4       A     Yes.

5       Q     Okay.  And what leads you to believe that

6  you have issues with your ribs?

7       A     Because the pain that's coming from it.

8       Q     And how long have you been experiencing

9  this pain?

10      A     Ever since -- ever since then.

11      Q     And what side is it?

12      A     It's my left side.

13      Q     Had you ever gone through the sick call

14  process, mentioned this to anybody?

15      A     Yes, sir.

16      Q     And had you ever received any treatment

17  for this?

18      A     No, sir.

19      Q     Can you provide any more specifics for me

20  on pain, is it just generalized pain?

21      A     It's a sharp pain, yes, sir.  It comes and

22  goes.

23      Q     How often is it present?

24      A     Like the weather, dealing with like the

25  weather sometimes.

```
 1              COURT REPORTER:  Start all over.  I'm
 2       sorry.
 3       A     (By the Witness)  Like the weather,
 4    dealing with like the weather sometimes.  I have
 5    like pains that be --
 6       Q     (By Mr. Urban) I didn't hear you that
 7    time.
 8       A     Dealing with the weather.
 9       Q     Weather?
10       A     Yes, sir.  Come about, like dealing with
11    the weather.  Like the coldness and stuff like that.
12       Q     Okay.  So if it gets cold, you start to
13    feel some --
14       A     Yes, sir.
15       Q     -- uncomfortability?
16       A     Yes, sir.
17       Q     Is that a fair assessment?
18       A     Yes, sir.
19       Q     Aside from when it gets cold out, do you
20    feel there's pain any other times?
21       A     No, sir.
22       Q     Okay.  Aside from -- from that, are there
23    any other medical conditions that you're not
24    currently being treated for but you believe you
25    should be treated for, if any?
```

Ex. A

1   time, because if they see medical right at that

2   time, they going to be more suspicious and

3   everything.  So that's why when they say stop, stop.

4        Q    Did you bring a knife to this fight or a

5   shank or anything like that?

6        A    Knife -- there was a knife a part of the

7   fight.  And actually inmate Williams had the knife

8   in the fight.

9        Q    I'm not talking about who had it in the

10  fight, I'm talking about who brought it to fight?

11       A    Yes.  I don't know who brought it to the

12  fight.  I know at the fight, during the time, he had

13  the knife in the fight and I took possession of the

14  knife.

15       Q    So the first time you see the knife

16  appear --

17       A    Yes, sir.

18       Q    -- is in Mr. Williams' hand?

19       A    Yes, sir.

20       Q    Didn't you tell Inspector Snow that you

21  brought the weapon to the fight?

22       A    Yes, I did tell Inspector Snow that.

23       Q    So you lied to Inspector Snow?

24       A    Yes, I did.

25       Q    Why did you lie to Inspector Snow?

Ex. A

1       A     Because I ain't want to just put it upon

2   no one else.

3       Q     You didn't want to snitch on Mr. Williams;

4   is that what you're saying?

5       A     Yes, sir.  And also Inspector Snow told me

6   -- promised me that this wasn't going to be nothing

7   behind it.

8       Q     What's that?

9       A     He told me there wasn't going to be no

10  issue behind it.

11      Q     So as long as you're promised something,

12  you've got -- of no issues coming of it, you have no

13  problem telling a lie?

14      A     I mean, I was not going to snitch on no

15  one.  That's one of the rules of prison.

16      Q     One of the rules of prison is you don't

17  snitch on anybody?

18      A     Yes, sir.

19      Q     So it's acceptable to tell a lie in order

20  to not break that rule, is that what you're saying?

21      A     If that's how you want to put it.

22      Q     I'm not asking how I'm going to put it,

23  I'm asking how you want to put it?

24      A     I'm not saying nothing is simple or it's

25  right.

```
 1            COURT REPORTER:  You're not saying it's

 2       what?

 3       A    (By the Witness)  I'm not saying it's

 4  right -- I'm not saying it's right.  At the same

 5  time, living inside the prison system, if you get

 6  labeled as a snitch, then you're going to have more

 7  problems that come upon you.

 8       Q    (By Mr. Urban) Well, tell me about that.

 9       A    Okay.  If you -- if you -- if you go

10  around and snitch on another inmate and other

11  inmates -- and other inmates hear about this, then

12  you're going to be labeled as a snitch as what they

13  call polices -- police inmate.  And a lot of inmates

14  going to be coming at you and do -- harass you and

15  try to do some violent things to you.

16       Q    Okay.  So ultimately, in the prison, you

17  do not want to be labeled a snitch; is that correct?

18       A    Yes, sir.

19       Q    Okay.  Is it fair to say that in order to

20  not be labeled a snitch, that you would go so far as

21  to lie so as to not be labeled a snitch?

22       A    Lying upon myself.  I'm not lying on

23  nobody else.

24       Q    If somebody asks you a direct question,

25  would you lie in order to not be labeled a snitch?
```

Ex. A

1        A     Lying upon myself.

2        Q     Tell me what you mean by that.

3        A     Basically it just -- basically what we

4   just talked about.  What we just talking about,

5   about lying instead of saying, oh, this person did

6   that, lying and said, oh, yeah, I did it.  That's

7   lying on yourself.

8        Q     So you're saying you would lie to admit

9   something in order to not snitch on somebody else;

10  correct?

11       A     I lied upon myself.  That's what I'm

12  telling you, sir, I lied upon myself.  Not on nobody

13  else.  I lied on myself.

14       Q     But now you're suggesting that

15  Mr. Williams had the knife; correct?

16       A     That's -- yes, sir, that's what I said.

17       Q     Okay.  So what's different now?

18       A     What do you mean?

19       Q     What's different now?  Now, you're able to

20  say that Mr. Williams had the knife, that you

21  didn't?

22       A     Because I was lied -- I was lied to.  I

23  was lied to saying there wouldn't be no issue behind

24  it, the whole thing.  I was lied to.

25       Q     Did you ever have possession of the weapon

Ex. A

1    during the fight?

2         A     Yes, sir.

3         Q     At what point?

4         A     At the point where I -- when I said we

5    wrapped up, we were wrestling and I took it from

6    him.

7         Q     And what did you do with it?

8         A     Saying Inmate Williams got injured --

9               COURT REPORTER:   What?   Start over.

10        A     (By the Witness) I can't actually remember

11   what all I did with it, because due to the whole

12   altercation, do you know what I'm saying.   So I

13   can't remember -- did I injure him with it or

14   whatever, I cannot actually say that.

15        Q     (By Mr. Urban) Is it you can't say it

16   because you don't remember or --

17        A     Yeah, I can't remember saying, you know,

18   during the fight, you can't just say everything that

19   you did, at the time of the fight.   And, to be

20   honest and, plus, I was highly on some -- well, what

21   you call it, I'm on psych medication, Wellbutrin.

22        Q     Were you on the Wellbutrin or did you

23   snort the Wellbutrin?

24        A     I snorted the Wellbutrin.

25        Q     You said you snorted the Wellbutrin?

1     A     Yes.

2     Q     Are you supposed to do that?

3     A     No, sir.

4     Q     How much did you snort?

5     A     I really can't remember how much, sir.

6     Q     So you're saying you can't remember what,

7  if anything, you did with the weapon?

8     A     Yeah, I cannot say that I didn't do

9  nothing with the weapon.  I cannot say that I did do

10  something with the weapon.  I cannot say that.

11     Q     If Mr. Williams had suffered puncture

12  wounds, are you suggesting that someone else

13  inflicted those puncture wounds?

14     A     I'm not really saying that either.  I'm

15  not saying that -- I'm not going to sit here and say

16  that somebody else injured Mr. Williams.  I'm not

17  going to sit here and say that I injured

18  Mr. Williams.  Like I stated, though, I really can't

19  say what took place at that time, sir.

20     Q     Are you going to be able to recall

21  anything that happened during the fight?

22     A     Am I going to be able to recall everything

23  what we're speaking of now?

24     Q     Right.  What are you able to recall during

25  the fight -- that happened during the fight?  You

1    that I personally did it.

2         Q    So Mr. Williams was immediately put in a

3    shower stall; is that what you're saying, after you

4    two were broken up?

5         A    Yes, sir.

6         Q    How did they break Mr. Williams and you

7    apart?

8         A    They pulled -- pulled us apart.

9         Q    Okay.  Did they, at any point in time,

10   tell you all to stop fighting?

11        A    Yes, sir.

12        Q    Who did, do you know?

13        A    Morris.  Sergeant Morris.

14        Q    Did y'all continue fighting?

15        A    Yes, sir.

16        Q    Why did you disobey his order to stop

17   fighting?

18        A    I really can't say why, why it took place.

19   When you fighting -- you fighting like stop.

20        Q    Do you -- you mentioned at some point in

21   time you had possession of the weapon?

22        A    Yes, sir.

23        Q    Did you have possession of the weapon when

24   the other officers came in?

25        A    When they came in to break it up?

Ex. A

1     Q     When the officers --

2     A     When the officers was in there I had --

3  because we all was in the shower area.  That's when

4  I got possession of the weapon.

5     Q     No, I mean, when the officers became

6  involved with you, engaged physically with you, did

7  you have the weapon, at that point in time?

8     A     Not that I know of.  Sergeant Morris said

9  that I cut him on his finger.  He said I injured him

10 on his finger.  I really cannot say in debate

11 against that how he even got the cut on his finger

12 though.

13    Q     So it's possible that you had the weapon

14 while you were engaged in a physical altercation

15 with the officers?

16    A     Me personally myself -- I'm just talking

17 about going by his statement --

18    Q     I'm not talking about other people's

19 statements.

20    A     No, myself.

21    Q     I'm talking about from your personal

22 knowledge, did you have possession of the weapon

23 when the officers became physically engaged with

24 you?

25    A     My personal knowledge I dropped the

1        A     Common sense.

2        Q     You're speculating on that?

3        A     Yeah, you can say that.

4        Q     That there's no possible way that it would

5    come from a puncture wound from a weapon?

6        A     It don't seem like no puncture wound.

7    It's a one centimeter scratch.

8        Q     So you're denying that you, at any point

9    in time, used the weapon on my of the officers?

10       A     No, I'm not denying it because he said

11   that I did so I'm sitting here denying that.  That's

12   not even my issue.  I'm denying saying I did or

13   didn't do it.

14       Q     So you're saying you don't know?

15       A     Yes.

16       Q     Talk to me about the medical examination

17   you received following this incident.

18       A     Okay.  When I went to medical, they had me

19   -- they had me in medical laying down on the bed --

20   before I went -- while they escorted me to the

21   medical, they had me a holding cell.  While I'm in

22   the holding cell, I'm yelling that I don't feel

23   good, I don't feel good.  So I'm laying down on the

24   floor and everything, telling them I don't feel good

25   because my eyes was like seeing the white dots and

Ex. A

1    everything was spinning.  So the nurses came and

2    told them -- to bring me in.  So they brought me in.

3    When they brought me in, they took my blood pressure

4    and, I think, they put like the things on my chest

5    to check my heart and everything like that.  And I

6    almost blanked out, do you know what I'm saying.  I

7    almost blanked out.  Then in medical, they say that

8    my blood pressure had shot sky high and it had

9    dropped over -- that everything had dropped and

10   everything.  So I know -- I was feeling pain in my

11   shoulder, like my collarbone.  I was complaining

12   about my collarbone and I remember telling them I

13   think my collarbone, I broke my collarbone is broke.

14        Q    Was your collarbone broken?

15        A    No, sir, it wasn't broke.

16        Q    Did that pain subside, go away?

17        A    It did not go away.

18        Q    That did go away?

19        A    Yes, sir.  It went away.

20        Q    What else, keep going?

21        A    Then after they got my blowed pressure

22   under control and everything, do you know what I'm

23   saying, by telling me to take a deep breath and

24   everything like that, they got it under control,

25   then they got me up and they sent me to max

1    management.

2              COURT REPORTER:  To where?

3              THE WITNESS:  Max management.

4              COURT REPORTER:  Max management?

5              THE WITNESS:  Yes, ma'am.

6        Q    (By Mr. Urban) With respect to the medical

7    care, did you have any issues with the medical care

8    that you were provided, at that time?

9        A    Not really, at that time.  But when they

10   sent me back to the dorm -- back to -- when they

11   sent me on the max management wing, Inspector Snow

12   had me pulled out, to talk to me.  And I told

13   Inspector Snow that I was having problems with my

14   rib, rib cage hurting me and everything.  And

15   Inspector Snow had them to take me back down to

16   medical.  When we went down to the medical and they

17   checked my rib and -- oh, ain't nothing wrong with

18   it.  They ain't did no x-ray, they didn't do none of

19   that.  They said, oh, ain't nothing wrong with it.

20       Q    Okay.  Did you receive any treatment or

21   request, aside from the pain in your rib, did you

22   receive or request any -- any treatment during your

23   post use of force examination?

24       A    You're talking about during --

25       Q    Right.  Did you say, hey, I need treatment

Ex. A

1  for this, this, and this or --

2      A    All that really happened -- all that

3  happened in the same day.  I did not actually -- the

4  only thing I complaining about was my shoulder.  But

5  I already when I seen Inspector Snow, that was like

6  -- that wasn't even 30 minutes after I just got

7  finished seeing medical.

8      Q    What injuries, if any, did you suffer as a

9  result of this incident?

10     A    Did I suffer, I already told you about the

11  rib.  And I had -- I had a little bruises on me.

12     Q    Okay.  Anything else?

13     A    No, sir.

14     Q    Okay.  What was your housing status on

15  this date?

16     A    CM-I, closed management I.

17     Q    Okay.  And what procedures, if you know,

18  are untaken or are supposed to be undertaken for you

19  to be removed from your cell when you're on this

20  status?

21     A    Okay.  When you get moved from your cell,

22  you have two officers at your cell.  They search

23  you.  They search you before they take you out of

24  your cell.  And when they take you out of your cell,

25  you back out your cell backwards, and both the

1      A    Yes, sir.

2      Q    What I'm having trouble with is why that

3  answer was so difficult before?

4      A    Because I couldn't understand -- I've got

5  a problem with comprehension.  I really ain't --

6  wasn't comprehending what all you was saying.

7           COURT REPORTER:  You have trouble

8      comprehending what he was saying?

9           THE WITNESS:  Yes, ma'am.  Yes, ma'am.

10     Q    (By Mr. Urban) I believe in your complaint

11  that you allege a 14th Amendment violation.

12  Describe how the Defendants violated the 14th

13  Amendment?

14     A    Through discrimation.  Discrimination.

15          COURT REPORTER:  Discrimination?

16          THE WITNESS:  Yes, ma'am.

17     Q    (By Mr. Urban) How are you alleging that

18  you were discriminated against, if that is what

19  you're alleging?

20     A    The officer -- discrimination means

21  basically you not given the same -- the inmate,

22  giving me -- they ain't giving me the same

23  protection as they giving all the other inmates.

24  Basically when you -- when you conspire and arrange

25  a fight, you do not -- treating all other inmates

Ex. A

1    the same type of way.  That's discrimination comes

2    down with conspiracy arranging of a fight to

3    inmates.

4         Q    So he's treating every other inmate or

5    these officers were treating every other inmate

6    differently than you?

7         A    Yeah.  The only inmate they got set up

8    like that with a fight is me and Rasheed Williams.

9         Q    For what reason are you alleging?

10        A    There you go again.  And I told you I

11   really cannot say the reason why they wanted me and

12   Rasheed Williams to fight.

13        Q    Is there any due process violation that

14   you're alleging?  You allege something under the

15   14th Amendment, is there some sort of due process

16   violation you're alleging and, if so, what is it?

17        A    I would have to say putting me -- placing

18   my life in danger -- in danger like that is

19   conspiring to fight, set up a fight, due process.

20        Q    Do you have any other topics that I didn't

21   touch on that you think are pertinent to this case?

22        A    I had a question to ask about did he get

23   my request dealing with those documents?

24        Q    I did.  I'll talk to you about that

25   afterwards, we can discuss that.  But with respect

Ex. A

1               **CERTIFICATE OF OATH**

2

3    STATE OF FLORIDA

4    COUNTY OF ESCAMBIA

5

6    I, the undersigned authority, certify that LESAMUEL

7         PALMER personally appeared before me and was

8         duly sworn.

9

10   WITNESS my hand and official seal this 9th day of

11        January, 2017.

12

13

14   _____

15        ELAINE RICHBOURG

16

17                              ELAINE RICHBOURG
                                MY COMMISSION # FF 941177
18                              EXPIRES: March 6, 2020
                                Bonded Thru Budget Notary Services

19

20

21

22

23

24

25

1

## 2        REPORTER'S DEPOSITION CERTIFICATE

3

4    I, ELAINE RICHBOURG, Court Reporter, certify that I
         was authorized to and did stenographically
5        report the foregoing deposition of LASAMUEL
         PALMER; and that a review of the transcript was
6        requested; and that the transcript is a true
         and complete record of my stenographic notes.
7
     I further certify that I am not a relative,
8        employee, attorney, or counsel of any of the
         parties, attorney or counsel connected with the
9        action, nor am I financially interested in the
         action.
10

11       Dated this 9th day of January, 2017.

12

13

14       ELAINE RICHBOURG, COURT REPORTER.

15

16

17       ELAINE RICHBOURG
         MY COMMISSION # FF 941177
         EXPIRES: March 6, 2020
         Bonded Thru Budget Notary Services

18

19

20

21

22

23

24

25